FILED
2022 Aug-29 PM 12:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

GREGORY CARROLL,      )
                     )
   Plaintiff,         )
                     )
    v.            )   Case No. 6:21-cv-00014-NAD
                     )
SOCIAL SECURITY     )
ADMINISTRATION,     )
COMMISSIONER,      )
                     )
   Defendant.      )

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Gregory Carroll filed for review of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability benefits. Doc. 1. Plaintiff Carroll applied for disability benefits with an alleged onset date of February 6, 2019. Doc. 12-4 at 29; Doc. 12-3 at 20. The Commissioner denied Carroll's claim for benefits. Doc. 12-3 at 8–20.

Pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties consented to magistrate judge jurisdiction. Doc. 22. After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Plaintiff Carroll argues that the court should reverse the Commissioner's decision for two reasons:  (1) the Administrative Law Judge (ALJ) erred by failing to properly consider Dr. Bruce Russell's opinions and impressions; and (2) substantial evidence does not support the ALJ's denial of benefits because, based on Carroll's testimony about his limitations and the testimony of the vocational expert, his limitations were work preclusive.  Doc. 17.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for

disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

(1)    whether the claimant is engaged in substantial gainful activity;

(2)    if not, whether the claimant has a severe impairment or combination of impairments;

(3)    if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)    if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)    if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform."

*Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).   If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act.  The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.**   With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at

1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar).  If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings."  *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding."  *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**B.**  With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."  *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.    Plaintiff Carroll's personal and medical history

Plaintiff Carroll was born on July 16, 1975, and was 43 years old at the time that he applied for disability benefits.  Doc. 12-4 at 28; Doc. 12-7 at 2.  Carroll worked as a self-employed brick mason beginning in 1994, but stopped working in 2008.  Doc. 12-7 at 6–7.  Carroll completed high school, but did not pursue further education.  Doc. 12-7 at 7.

On June 17, 2015, Carroll saw Dr. John Cherian at Walker Cardiology Associates for episodes of chest pain.  Doc. 12-8 at 54.  Dr. Cherian prescribed blood pressure medication.  Doc. 12-8 at 55.

On August 11, 2015, Carroll presented to the Walker Emergency Department in Jasper, Alabama, with fatigue, dizziness, and chest pain.  Doc. 12-8 at 29.  Carroll was diagnosed with an upper GI bleed and a hiatal hernia.  Doc. 12-8 at 48–53.

On October 29, 2015, Carroll had an appointment with Dr. John Featheringill at OrthoSports Associates for severe chronic left shoulder pain.  Doc. 12-8 at 13.  An MRI was ordered (Doc. 12-8 at 14), which showed a rotator cuff tear in Carroll's left shoulder.  Doc. 12-8 at 12.  Carroll returned to OrthoSports on December 10, 2015, and Dr. Featheringill diagnosed him with a rotator cuff tear, then advised Carroll to consider whether he wanted to pursue surgical intervention or physical therapy.  Doc. 12-8 at 37.

On April 6, 2016, Carroll had an MRI of his lumbar spine that showed mild degenerative disc disease with well maintained disc height and no stenosis.  Doc. 12-8 at 9–10.  On the same day, Carroll also had another MRI of his left shoulder, which found no abnormalities other than fluid in the joint indicating bursitis.  Doc. 12-8 at 15.  He also had an MRI of his cervical spine, which showed disc bulging, broad base disc protrusion, severe foraminal narrowing, and spinal stenosis. Doc. 12-8 at 16.

On June 8, 2016, Carroll had an initial office visit with Dr. R.J. Johnson, Jr. at the Haynes Neurosurgical Group in Birmingham, Alabama, complaining of neck and low back pain.  Doc. 12-8 at 28.  Dr. Johnson noted that Carroll was a little anxious and in some discomfort but pleasant, that Carroll stood and walked normally and had full strength, and that he did not have a motor deficit.  Doc. 12-8 at 28.  Dr. Johnson noted that Carroll's MRI results were potentially concerning and ordered further imaging.  Doc. 12-8 at 28.

On July 6, 2016, Carroll had a CT scan with contrast of his lumbar spine due to low back pain.  Doc. 12-8 at 19.  The lumbar CT scan identified mild lumbar spondylosis without significant stenosis or foraminal narrowing.  Doc. 12-8 at 19. Carroll also had a CT scan with contrast of his cervical spine, which showed mild to moderate stenosis with mild ventral cord surface flattening and mild foraminal narrowing.  Doc. 12-8 at 23–24.

On July 13, 2016, Carroll again saw Dr. Johnson at the Haynes Neurosurgical Group.  Doc. 12-8 at 8.  Carroll was diagnosed with chronic neck and low back pain, arm complaints, and "degenerative disk disease with foraminal stenosis C4-5, C3-4."  Doc. 12-8 at 8.  Dr. Johnson noted in his records that Carroll appeared comfortable moving freely and had no limitations of movement.  Doc. 12-8 at 8. Carroll's demeanor was described as "anxious" but "pleasant."  Doc. 12-8 at 8.  Dr. Johnson noted that imaging showed degenerative disc disease with "broad base

7

bulges" and mild foraminal narrowing in Carroll's cervical spine without active cord compression, some broad base bulges in the thoracic spine without significant cord involvement, and an essentially normal lumbar spine.  Doc. 12-8 at 8.  Dr. Johnson stated that Carroll's neck and arm pain was "possibly in part due to the degenerative changes" in his cervical spine.  Doc. 12-8 at 8.  Dr. Johnson recommended that Carroll consider surgery on his cervical spine, but noted that problems with his cervical spine did not explain all of his symptoms.  Doc. 12-8 at 9.

On January 17, 2017, Carroll had his left rotator cuff surgically repaired.  Doc. 12-8 at 91.

On January 23, 2017, Carroll saw Dr. Bruce Russell for shoulder, back, and neck pain.  Doc. 12-8 at 94.

On February 4, 2017, Carroll went to the Princeton Baptist Medical Center Emergency Department in Birmingham, Alabama, with complaints of chest pain.  Doc. 12-8 at 90.  Carroll was diagnosed with gastroesophageal reflux disease (GERD).  Doc. 12-8 at 93.

On February 9, 2017, Carroll saw Dr. Russell again for anxiety and hiatal hernia pain.  Doc. 12-8 at 89.  Dr. Russell prescribed Xanax and Percocet.  Doc. 12-8 at 89.

On March 17, 2017, Carroll returned to see Dr. Johnson at the Haynes Neurosurgical Group.  Doc. 12-8 at 88.  Carroll was suffering from "some neck

pain," and had "some numbness in his thumb and [the] first two digits of his right hand," as well as burning in his lower back. Doc. 12-8 at 88. Dr. Johnson noted that Carroll looked well, was in good spirits, and had good range of motion, normal strength, easy movement, and no pain behavior. Doc. 12-8 at 88. Carroll was diagnosed with persistent neck and back pain of uncertain cause, and new imaging was recommended. Doc. 12-8 at 88.

On August 14, 2017, Carroll saw Dr. Russell with severe pain in his neck, back, and shoulder, swelling in his back, and severe pain and swelling in his knees. Doc. 12-8 at 86. Dr. Russell injected both of Carroll's knees. Doc. 12-8 at 86.

On December 17, 2017, Carroll again saw Dr. Russell for complaints of chronic knee, back, neck, and shoulder pain, as well as popping knees, toe pain in his left foot, and problems with his left shoulder possibly requiring surgery that Carroll could not afford due to lack of insurance. Doc. 12-8 at 84. Dr. Russell noted that Carroll had full range of motion. Doc. 12-8 at 84. The treatment plan was to continue medication, including Percocet for pain. Doc. 12-8 at 85. Carroll saw Dr. Russell again in February, April, and May 2018 for pain in his neck, back, and knees, and was treated with pain medication. Doc. 12-8 at 81–83.

On June 19, 2018, Dr. Russell submitted a letter stating only as follows:

> To whom it may concern: My patient Gregory Shane Carroll[] is totally disabled and unable to perform daily tasks. He is permanently disabled also. If you have any questions or concerns, please call the above number.

9

Doc. 12-8 at 80.

On June 22, 2018, Carroll saw Dr. Russell for severe pain in his shoulder, back, and knees, and for swelling. Doc. 12-8 at 79. Dr. Russell noted that Carroll needed surgery and had been prescribed pain medication. Doc. 12-8 at 79. Carroll saw Dr. Russell again on August 27, 2018, though the records are illegible. Doc. 12-8 at 78.

On October 2, 2018, Dr. Russell submitted a letter that stated in full the following:

> Due to severe pain of the cervical spine, [and] severe pain of the shoulder, it is my opinion [that] Mr. Carroll is not able to perform any work. If you should have any further questions, please contact my office.

Doc. 12-8 at 77.

On March 30, 2019, Carroll filled out a function report as part of his disability proceedings. Doc. 12-7 at 12. Carroll stated that he lived at home with his wife. Doc. 12-7 at 12. He stated that he sat and watched television during the day until his back started hurting, but had to lie down 3 to 4 times a day, and had to get up and down throughout the night because of cramps. Doc. 12-7 at 12, 16. He stated that he did "basically nothing." Doc. 12-7 at 12. Carroll stated that pain while lifting up his arms affected his ability to complete daily tasks like getting dressed and bathing. Doc. 12-7 at 16. Carroll stated that he needed a reminder to take medicine because he was "forgetful." Doc. 12-7 at 17. Carroll stated that he did not prepare meals

because he could not stand for very long, and did no house or yard work because he was not able to do so.  Doc. 12-7 at 17.  He stated that he only went out to go to doctor's appointments, and did not shop because he could not turn his head due to prior neck surgery.  Doc. 12-7 at 18.  He stated that he did not handle money, and that all he could do was watch television until his back pain required him to lie down. Doc. 12-7 at 19.

Carroll stated that his conditions affected virtually all of his abilities, that he could only walk about 20 feet, that he could not lift more than 10 pounds, that he could not pay attention for very long, and that he did not follow instructions well. Doc. 12-7 at 20.  Carroll stated that he did not handle stress well because of anxiety disorder, but that he never had been forced to leave a job for failing to get along with people.  Doc. 12-7 at 21.  He stated that he sometimes used crutches or braces for his knees, back, and neck.  Doc. 12-7 at 21.  Carroll then stated that he had problems with his heart, esophagus, acid reflux, migraine headaches, ankles, elbows, hands, spine, swelling in his hands and knees, major heartburn, hiatal hernia, arthritis, a bulging and herniated disc in his lower back, and burning in his neck and shoulders. Doc. 12-7 at 22.

On March 22, 2019, Carroll's mother filled out a function report for Carroll. Doc. 12-7 at 26.  Carroll's mother stated that Carroll was "unable to do anything" and only watched television and slept.  Doc. 12-7 at 26, 30.  She stated that she

prepared Carroll's meals, and that he could not do any chores or yard work because of his pain.  Doc. 12-7 at 28.  She also stated that Carroll could not go out alone "because of falling," and did not shop because he was "not able."  Doc. 12-7 at 29. Carroll's mother stated that his conditions affected all of his abilities, that he could only walk 20 to 50 feet, that he could not focus or follow instructions well, that he did not handle stress or changes in routine well, and that he sometimes used splints or braces.  Doc. 12-7 at 31.

On April 20, 2019, Dr. Adebimpe Oyowe performed a consultative examination as part of Carroll's disability proceedings, noting that Carroll had alleged lower back, ankle, hand, shoulder, and knee pain, headaches, and hypertension.  Doc. 12-8 at 66.  Dr. Oyowe stated that Carroll had hypertension treated with medication, COPD and asthma, pain and difficulty in his left shoulder, elbow and knee pain, difficulty in the lumbar vertebrae, a history of unmedicated anxiety syndrome, and a history of occipital headaches. Doc. 12-8 at 67.  Dr. Oyowe noted that Carroll had no edema (swelling).  Doc. 12-8 at 67.  Dr. Oyowe also noted that Carroll never had been hospitalized for mental health issues, that he was not taking any medication for his mental health, and that his mental condition did not affect his ability to work.  Doc. 12-8 at 67.  Dr. Oyowe stated that Carroll's headaches occurred approximately daily for about 2 hours at a time and were relieved by over-the-counter medication.  Doc. 12-8 at 67.

Dr. Oyowe stated that Carroll did not use an ambulatory device to get around, but that Carroll reported that he could only walk a "very short distance on level ground." Doc. 12-8 at 67. Dr. Oyowe stated that Carroll reported that he could feed and dress himself, but had difficulty standing for 15 to 30 minutes and lifting more than 25 to 50 pounds with each arm. Doc. 12-8 at 67. Dr. Oyowe stated that Carroll reported that he could not do any household chores or any yard work, but had no difficulty turning a doorknob or walking up stairs. Doc. 12-8 at 67.

Dr. Oyowe stated that Carroll appeared clean and well groomed. Doc. 12-8 at 68. Carroll could get in and out of a chair and on and off an exam table without difficulty, and could walk with a normal gait without difficulty. Doc. 12-8 at 68. Carroll could walk on his toes and his heels. Doc. 12-8 at 69. He could squat and bend over to touch his toes, but verbalized pain as he did so. Doc. 12-8 at 69. Carroll had normal grip strength and motor skills. Doc. 12-8 at 69–70. His range of motion was within normal limits. Doc. 12-8 at 70.

Dr. Oyowe opined that all of Carroll's conditions had a good prognosis. Doc. 12-8 at 70. He also opined that Carroll had no limitations. Doc. 12-8 at 71.

On May 10, 2019, Dr. Robert Kline, Ph.D., conducted a consultative psychological examination of Carroll as part of his disability proceedings. Doc. 12-8 at 73. Dr. Kline stated that, when he asked Carroll about his conditions that could cause him to be disabled, Carroll stated that he had problems with his back, left knee,

and foot, and had acid reflux, high blood pressure, liver problems, and nerve problems. Doc. 12-8 at 73. Dr. Kline stated that Carroll had no history of psychiatric treatment, took unknown amounts of Xanax, and took other medication for pain that Carroll believed was working well and had no side effects. Doc. 12-8 at 73. Carroll stated that Xanax controlled his anxiety symptoms. Doc. 12-8 at 73. Carroll stated that his physical problems, especially his back, prevented him from working. Doc. 12-8 at 73.

Dr. Kline stated that Carroll was appropriately dressed, and that his grooming and hygiene were normal. Doc. 12-8 at 74. Dr. Kline observed Carroll walking and getting in and out of the seated position, both of which Carroll was able to do normally. Doc. 12-8 at 74. Dr. Kline stated that Carroll's thought process, conversation, and affect were normal, and that he displayed no signs of anxiousness. Doc. 12-8 at 74. Dr. Kline stated that Carroll was adequately oriented, and that Carroll completed exercises indicating adequate concentration, attention, and memory. Doc. 12-8 at 74. Dr. Kline found that Carroll's insight was good, and that his IQ likely fell in the normal range. Doc. 12-8 at 75. Dr. Kline stated that Carroll reported that, because of his physical condition, all he did was watch television, and he could not do any house work, outdoor activities, or attend church. Doc. 12-8 at 75. Carroll stated that he went to stores about once a month and only talked to his immediate family. Doc. 12-8 at 75.

Dr. Kline stated that Carroll did not meet the criteria for a diagnosis of anxiety, that Carroll's medication was working, and that his anxiety was in remission. Doc. 12-8 at 75. Dr. Kline also stated that, based on observation, he was "almost certain" that Carroll "was malingering about his physical abilities." Doc. 12-8 at 75. Dr. Kline stated that the prognosis for Carroll's mental health was "very good," though his "effort and motivation were questionable." Doc. 12-8 at 75. Dr. Kline opined that Carroll had an unknown restriction of activities and, at worst, a mild restriction in ability to relate to others, with no history of mental slowness. Doc. 12-8 at 75. Dr. Kline stated that Carroll had the abilities to function independently, to understand, carry out, and remember instructions, and to behave appropriately in a workplace setting. Doc. 12-8 at 75.

On August 13, 2019, Dr. Russell submitted another letter that stated as follows:

> Mr. Carroll is permanently[,] totally disabled, and unable to perform daily tasks. He has severe arthritis, low back pain, neck pain, as well as shoulder pain. Along with this, he has a history of anxiety, depression, insomnia, hypertension, and GERD. If you should have any further questions, please contact my office.

Doc. 12-8 at 98.

### B.    Social Security proceedings

#### 1.    Initial application and denial of benefits

On February 6, 2019, Carroll filed an initial application for supplemental

security income, alleging the following impairments: "left knee locks up, both knees swell, need [rotator] cuff surgery RT shoulder, herniated disc, lumbar problems, acid reflux, asthma, anxiety, heart murmur, GI bleed, hypertension, hyperlipidemia, kidney failure, [hiatal] hernia, feet swell, can't feel right thumb, index and mid finger." Doc. 12-4 at 29, 47.[1]  He alleged an onset date of February 6, 2019.  Doc. 12-4 at 29.

In May 2019, Carroll's initial application for benefits was denied based on a finding that Carroll was capable of performing certain types of work and did not meet the requirements for disability benefits.  Doc. 12-4 at 28–47.  Dr. Robert Estock and Dr. Gloria Sellman submitted non-examining opinions that Carroll had only mild limitations caused by mental impairments, and that he could perform work at a medium level.  Doc. 12-4 at 39–43.

In August 2019, Carroll requested a hearing before an ALJ.  Doc. 12-5 at 13–14.

### 2.    ALJ hearing

On March 10, 2020, the ALJ conducted an in-person hearing to determine whether Carroll was disabled.  Doc. 12-3 at 29–30.

Carroll testified at the hearing that he was right-handed.  Doc. 12-3 at 34.  He

---

[1] Carroll previously filed for disability benefits in 2015, and his application was denied by an ALJ on October 31, 2017.  Doc. 12-4 at 2–16.

testified that he was married and had two children, aged 18 and 19, who no longer lived at home. Doc. 12-3 at 34. Carroll stated that he lived with his wife, but that they had no income because his wife also was filing for disability; he testified that they went to his mother's house—about "a football field away"—to eat, and that his mother paid his bills. Doc. 12-3 at 35.

Carroll stated that he had a driver's license and did not "drive every day," but that he could drive when he needed to do so. Doc. 12-3 at 35. Carroll testified that he graduated high school with a certificate of completion rather than a diploma and took special education classes. Doc. 12-3 at 36. He stated that he could read and write "some" and did not have problems keeping up with small amounts of money. Doc. 12-3 at 36. However, he stated that he did not have a checking account because his mother kept up with his money. Doc. 12-3 at 36. Carroll testified that usually his mother obtained food and toiletries for him, but that occasionally his mother would give him $10 or $15 and he would go to the store and buy tobacco and a newspaper. Doc. 12-3 at 37. Carroll testified that his last work was in 2008, doing work in concrete and masonry. Doc. 12-3 at 38.

In response to questioning from the ALJ, Carroll testified that he suffered from degenerative disc disease in his back, degenerative joint disease that had required surgery in his left shoulder, a hiatal hernia in his throat, high blood pressure, high cholesterol, asthma, reflux disease, anxiety disorder, pain in his back, pain in

his neck, pain in his shoulders, and a problem with his left foot after a previous fracture.  Doc. 12-3 at 39.  Carroll testified that "all day" he just sat and watched television.  Doc. 12-3 at 40.  He stated that he could not do light work because of headaches and because, after a previous surgery on his neck in 2015 or 2016, he could not feel his fingers.  Doc. 12-3 at 40.  Carroll stated that he understood from his physician, Dr. Russell, that he needed surgery on his back and his right shoulder. Doc. 12-3 at 40.

In response to questioning from counsel, Carroll testified that he experienced swelling in his legs and feet that he treated with elevation "nearly every day."  Doc. 12-3 at 41.  Carroll testified that he needed surgery on his left foot, knee, right shoulder, and back.  Doc. 12-3 at 41.  He stated that he suffered from depression as well as anxiety, and that he would be seeking treatment for his mental health but he did not have insurance.  Doc. 12-3 at 42.  Carroll stated that for pain he took Norco 10s (for which his mother paid), and was supposed to be taking 4 per day, but sometimes did not take all 4.  Doc. 12-3 at 42–43.  He stated that the pills helped "some."  Doc. 12-3 at 43.  Carroll stated that without medication his pain was typically at a level 8 out of 10, and the degree to which the Norco helped his pain varied.  Doc. 12-3 at 43.  He also testified that he did not like taking the Norco because the side effects made it seem like "everything echoes."  Doc. 12-3 at 43. Carroll stated that he was not taking his other medications because he could not

18

afford them without insurance.  Doc. 12-3 at 43–44.

Carroll testified that he had migraine headaches on a nearly daily basis, during which he could not look at or be around light.  Doc. 12-3 at 44–45.  He testified that he could only pick up about 5 pounds without pain.  Doc. 12-3 at 45.  He stated that he could stand still for about 5 minutes, and could only sit with his "left leg kicked out" due to swelling, as he had to have fluid drained from his knee.  Doc. 12-3 at 45–46.  He stated that he could walk about 100 feet and was unable to do anything around the house.  Doc. 12-3 at 46–47.

A vocational expert (Julia Russell) testified that a person capable of unskilled light work who could occasionally climb ramps or stairs, could not climb ladders, ropes, or scaffolds, could occasionally stoop, kneel, crouch, or crawl, and could frequently reach bilaterally could perform jobs that existed in significant numbers in the national economy, including the jobs of marker, cleaner, and inspector and hand packager.  Doc. 12-3 at 48.  The vocational expert testified that, if a person could only reach bilaterally occasionally, that would "greatly erode the job availability," but the person still could work as a school bus monitor or a fruit distributor.  Doc. 12-3 at 49.  She testified that missing more than 1 day of work per month on a sustained basis or being off task 20% of a normal workday would be work preclusive.  Doc. 12-3 at 49–50.  She also stated that an inability to use the right hand would be work preclusive.  Doc. 12-3 at 50.

### 3.    ALJ decision

On March 26, 2020, the ALJ entered an unfavorable decision, finding that Carroll had "not been under a disability, as defined in the Social Security Act, since February 6, 2019," the date of his application.  Doc. 12-3 at 8–20.

In the decision, the ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. § 416.920(a); *Winschel*, 631 F.3d at 1178).  Doc. 12-3 at 11–20. At step one, the ALJ found that Carroll had not engaged in substantial gainful employment since February 6, 2019, the date of his application and the alleged onset date.  Doc. 12-3 at 13.  At step two, the ALJ found that Carroll had severe impairments of degenerative disc disease and degenerative joint disease of the shoulders.  Doc. 12-3 at 13.  The ALJ found that, in addition to Carroll's severe impairments, he suffered from nonsevere impairments of degenerative joint disease of the knees, hiatal hernia, essential hypertension, hyperlipidemia, asthma, headaches, and GERD.  Doc. 12-3 at 13.  The ALJ found that knee pain was noted throughout the record, but examination showed normal knee movement.  Doc. 12-3 at 13.  The ALJ also found that the record showed that Carroll's hiatal hernia, hypertension, hyperlipidemia, and asthma were conservatively managed, that his headaches were relieved with over-the-counter medication, and that his GERD was treated with medication.  Doc. 12-3 at 13–14.  The ALJ found that the nonsevere impairments did not cause more than minimal limitation of Carroll's ability to perform basic work activities.  Doc. 12-3

at 14.

Additionally, the ALJ found that Carroll had medically determinable mental impairments of depression and anxiety, but that they were nonsevere—i.e., that they did not cause more than minimal limitation of Carroll's ability to perform basic work activities.  Doc. 12-3 at 14.  The ALJ noted that Carroll's anxiety appeared to be in remission, and that Carroll never had been hospitalized for mental health reasons and did not take medication or receive inpatient treatment for his mental health conditions.  Doc. 12-3 at 14.  The ALJ found that Carroll had only mild limitations in the relevant four broad functional areas of (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself.  Doc. 12-3 at 14.

The ALJ found at step three that Carroll did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in applicable Social Security regulations.  Doc. 12-3 at 15.

The ALJ then determined Carroll's RFC, finding that he could "perform light work" except that he could only occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, occasionally stoop, kneel, crouch, or crawl, frequently reach bilaterally, and never be exposed to workplace hazards.  Doc. 12-3 at 15.  The ALJ's decision stated that the ALJ had considered all of Carroll's symptoms and the extent to which they reasonably could be accepted as consistent with the evidence,

according to 20 C.F.R. § 416.929 and Social Security Ruling (SSR) 16-3p.  Doc. 12-3 at 15.  The ALJ's decision also stated that the ALJ had considered medical opinions and prior administrative medical findings.  Doc. 12-3 at 15.

In assessing Carroll's RFC and the extent to which his symptoms limited his function, the ALJ's decision stated that the ALJ "must follow" the required "two-step process":  (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."  Doc. 12-3 at 16.

The ALJ then summarized Carroll's account of his limitations, stating that Carroll had testified to "very little functional ability at the hearing," including that he had to elevate his knees and feet, that he took medication that was somewhat helpful, and that he could only stand for about 5 minutes at a time.  Doc. 12-3 at 16. The ALJ evaluated Carroll's symptoms according to SSR 16-3p—recognizing that some individuals experience symptoms differently—and found that the extreme limitations to which Carroll testified were inconsistent with and unsupported by the objective medical evidence and other evidence in the record.  Doc. 12-3 at 16.  In considering the evidence, the ALJ then found that Carroll's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms,

but that Carroll's statements about the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence or other evidence in the record.  Doc. 12-3 at 16.

In support of that determination, the ALJ found that the evidence did not support Carroll's alleged loss of functioning because of a lack of consistent or aggressive treatment for any of Carroll's conditions and a lack of objective evidence or clinical findings supporting Carroll's alleged limitations.  Doc. 12-3 at 16.  The ALJ stated that, despite a long history of back problems, imaging showed mostly mild or minimal abnormalities and Carroll had a normal gait and range of motion.  Doc. 12-3 at 16–17.  Similarly, the ALJ stated that imaging revealed some degenerative changes in Carroll's left shoulder, but he had normal range of motion in his shoulders in August 2019.  Doc. 12-3 at 17.

The ALJ stated that Dr. Oyowe had found that Carroll could get in and out of a chair and on and off an exam table, could ambulate without difficulty, and had normal grip strength and a full range of motion.  Doc. 12-3 at 17.  The ALJ also stated that Dr. Kline had found that Carroll had normal behavior and controlled his mental health symptoms with medication such that his anxiety was in remission.  Doc. 12-3 at 17.  The ALJ also stated that Dr. Kline "highlighted that the claimant had no history of mental slowness," and opined that Carroll was malingering about his physical abilities.  Doc. 12-3 at 17.

The ALJ's decision then stated that current regulations provided that the ALJ should analyze the persuasiveness of medical opinions and prior administrative findings by evaluating, among other things, supportability and consistency. Doc. 12-3 at 17. The ALJ found the opinions of the non-examining disability determination physicians to be moderately persuasive. Doc. 12-3 at 18. The ALJ found Dr. Oyowe's opinion mostly persuasive and supported, but found that the record indicated that Carroll actually had greater limitations than Dr. Oyowe opined. Doc. 12-3 at 18. Likewise, the ALJ found that Dr. Kline's opinion was mostly persuasive and consistent with the record as a whole. Doc. 12-3 at 18.

The ALJ reviewed the findings of Dr. Russell, but did not consider Dr. Russell's statements that Carroll was totally disabled to be a medical opinion under the applicable regulations—because those were statements on an ultimate issue reserved for the Commissioner, and consequently were neither valuable nor persuasive. Doc. 12-3 at 18. However, the ALJ considered Dr. Russell's treatment records in considering Carroll's RFC, and found that Dr. Russell's statements about extreme limitations were not supported by objective evidence, not consistent with his plan to treat Carroll with only medication, and not consistent with Carroll's full range of motion. Doc. 12-3 at 18.

At step four, the ALJ found that Carroll had no past relevant work. Doc. 12-3 at 19. The ALJ then found at step five that, based on the testimony of the

vocational expert and Carroll's age, education, work experience, and RFC, Carroll was capable of performing jobs that existed in significant numbers in the national economy. Doc. 12-3 at 20. Those jobs included marker, cleaner, and inspector/hand packager. Doc. 12-3 at 20.

Accordingly, the ALJ found that Carroll had not been disabled since February 6, 2019, the date of his application and his alleged onset date. Doc. 12-3 at 20.

### 4. Appeals Council decision

Carroll sought review from the SSA Appeals Council. Doc. 12-3 at 2. On November 3, 2020, the Appeals Council denied the request for review, finding no reason to review the ALJ's decision. Doc. 12-3 at 2. Because the Appeals Council found no reason to review the ALJ's opinion, the ALJ's decision became the final decision of the Commissioner.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.

## I. The ALJ did not err in considering the evidence from Dr. Russell or in finding that it was not persuasive.

The ALJ did not err in refusing to consider as medical opinions the letters from Dr. Russell about Plaintiff Carroll's disability status, and did not err in finding unpersuasive Dr. Russell's determinations of Carroll's limitations.

For all disability claims filed on or after March 27, 2017 (like the claim in this case), an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including the opinion of a treating physician.  20 C.F.R. § 416.920c(a).  Instead, the ALJ considers the persuasiveness of each medical opinion using the following five factors:  (1) supportability; (2) consistency; (3) the relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, and the purpose and extent of the treatment relationship; (4) specialization; and (5) other factors, including evidence showing that the medical source has familiarity with other evidence or an understanding of the SSA's policies and evidentiary requirements.  20 C.F.R. § 416.920c(c).

Supportability and consistency are the most important factors, and the ALJ must explain how the ALJ considered those factors.  20 C.F.R. § 416.1920c(b)(2).  The ALJ may explain how the ALJ considered the other factors, but the ALJ is not required to do so.  20 C.F.R. § 416.920c(b)(2).

A medical opinion for the purposes of assessment of a disability claim "is a statement from a medical source about what [a claimant] can still do despite [his] impairment(s)."  20 C.F.R. § 416.913(a)(2).  Medical opinions are "about impairment-related limitations and restrictions in" the ability to perform the demands of work—for instance, physical demands like sitting, standing, and

walking, and mental demands like understanding, remembering, and carrying out instructions.  20 C.F.R. § 416.913(a)(2)(i).  Opinions on issues reserved for the Commissioner, including statements about whether a claimant is disabled, able to perform work, or has severe impairments, are "inherently neither valuable nor persuasive."  20 C.F.R. § 416.920b(c)(3).

As an initial matter, the ALJ did not err in determining that Dr. Russell's letters were not medical opinions and were neither valuable nor persuasive.  *See* Doc. 12-3 at 18.  In his June 19, 2018 letter, Dr. Russell stated only that Carroll was totally and permanently disabled and was "unable to perform daily tasks."  Doc. 12-8 at 80.  Similarly, in his October 2, 2018 letter, Dr. Russell stated that, because of Carroll's pain, he "is not able to perform any work."  Doc. 12-8 at 77.  And, in his August 13, 2019 letter, Dr. Russell stated that Carroll was totally and permanently disabled and unable to perform daily tasks, and then just listed Carroll's various conditions.  Doc. 12-8 at 98.

Contrary to the regulations defining medical opinions, none of Dr. Russell's letters provided any kind of specific statement about what Carroll still could do despite his impairments, or described any details about Carroll's limitations and restrictions in performing the demands of work.  *See* 20 C.F.R. § 416.913(a).  Rather, the letters contained only conclusory statements about Carroll's status as disabled and his ability to work.  Those decisions are reserved for the Commissioner (20

C.F.R. § 416.920b(c)(3)), and consequently the ALJ did not err in disregarding Dr. Russell's letters about Carroll's disability.

Moreover, the ALJ specifically found that Dr. Russell's determinations about Carroll's limitations were unpersuasive, and considered the required factors in making that finding.  In considering Dr. Russell's treatment records, the ALJ stated that "Dr. Russell's extreme limitations are not supported by other evidence in the claim, and they are not consistent with his own treatment plan, which consists mainly of pain medication."  Doc. 12-3 at 18.  Accordingly, the ALJ explicitly considered the required factors of supportability and consistency (*see* 20 C.F.R. § 416.1920c(b)(2)), and found that Dr. Russell's opinion about the extent of Carroll's limitations was unpersuasive.  That analysis and explanation satisfies the ALJ's regulatory obligation to consider a medical opinion under the new regulations. *See* 20 C.F.R. § 416.1920c(b)(2).

The ALJ's decision that Dr. Russell's assessment of Carroll's limitations was unpersuasive also is supported by substantial evidence.  While Dr. Russell's letters indicated that he thought Carroll was completely disabled, evidence from his treatment records showed primarily only pain and swelling.  *See* Doc. 12-8 at 83–86.  Meanwhile, Dr. Russell noted that Carroll had full range of motion and mostly treated Carroll only with pain medication.  Doc. 12-8 at 84–85.  Further, Dr. Russell's notes conflict with other evidence in the record.  For instance, both Dr.

Oyowe and Dr. Kline noted that they observed that Carroll had no trouble moving around.  Doc. 12-8 at 68–70, 74–75.  Imaging also showed only relatively mild degenerative changes to Carroll's spine and shoulders (Doc. 12-8 at 8–10, 15–16, 19, 23–24), and Dr. Johnson noted that cervical spine issues did not explain all of Carroll's symptoms (Doc. 12-8 at 9).

While Carroll's brief argues that Dr. Russell's "long doctor-patient relationship with Mr. Carroll also adds credibility to his opinions" (Doc. 17 at 12–13 (citation omitted)), the ALJ found that Carroll's "[v]isits to Dr. Russell [we]re infrequent and do not support totally disabling limitations" (Doc. 12-3 at 18).  In this regard, the ALJ also found that "Dr. Russell's most recent available examination, conducted on December 28, 2017, states 'extremities present with full range of motion against resistance and gravity.'"  Doc. 12-3 at 18 (citation omitted).  As such, the length of Dr. Russell's relationship with Carroll does not present evidence that calls into question the ALJ's findings.

Thus, a reasonable person would accept Dr. Russell's conservative treatment of Carroll's alleged symptoms, along with the other evidence in the record calling into question the severity of Carroll's symptoms, as adequate to support a decision that Dr. Russell's determinations were not consistent with or supported by the record.  *See Crawford*, 363 F.3d at 1158.

Accordingly, the ALJ did not err in considering the evidence from Dr. Russell.

29

## II.     Substantial evidence supported the ALJ's finding that Carroll was not disabled.

Substantial evidence supported the ALJ's finding that Carroll did not have such severe limitations that he could not work, and consequently that he was not disabled.  While Carroll argues that the ALJ did not discredit Carroll's testimony about his symptoms and limitations, and that those limitations precluded work (according to testimony from the vocational expert, *see* Doc. 17 at 14–15), the record shows that the ALJ properly *did* discredit Carroll's testimony about the severity of his symptoms and limitations (*see* Doc. 12-3 at 16).  Substantial evidence supported both the ALJ's decision to discredit Carroll's testimony, and the ALJ's finding that Carroll was not disabled.

### A.     The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ properly applied the relevant multi-part "pain standard" in assessing Carroll's disability claim.  When a claimant attempts to establish disability through his own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies.  That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms.  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th

30

Cir. 2002); *see also* 20 C.F.R. § 416.929 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [his] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled."  20 C.F.R. § 416.929(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, the ALJ's decision articulated and tracked that controlling legal standard.  In analyzing Carroll's RFC, and the extent to which Carroll's symptoms limited his functioning, the ALJ's decision reasoned that the ALJ "must follow" the required "two-step process":   (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."  Doc. 12-3 at 16.  The ALJ then found that Carroll's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, but that Carroll's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other

evidence in the record" for reasons that the ALJ went on to explain.  Doc. 12-3 at 16.[2]  Thus, the ALJ's decision was based on the proper legal standards.

**B.    The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.**

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.  *Wilson*, 284 F.3d at 1225.  A claimant can establish that he is disabled through his "own testimony of pain or other subjective symptoms."  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements."  20 C.F.R. § 416.929(c)(2).

---

[2] Carroll's brief argues that "SSR 16-3p directs the ALJ to consider a number of factors before making a conclusion regarding the validity of a claimant's testimony and resulting limitations."  Doc. 17 at 13–14.  But, in this respect, the ALJ reasoned that, "[i]n accordance with SSR 16-3p, in evaluating the claimant's subjective symptoms, . . . some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments."  Doc. 12-3 at 16.  The ALJ then found that "the extreme limitation described by [Carroll] is inconsistent with and not supported by the objective medical evidence and other evidence contained in this claim."  Doc. 12-3 at 16.  So, the ALJ's decision was guided by and consistent with SSR 16-3p.

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of his symptoms, the ALJ must consider all of the evidence, objective and subjective. 20 C.F.R. § 416.929. Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, his precipitating and aggravating factors, his daily activities, the type, dosage, and effects of his medications, and treatments or measures that he has to relieve the symptoms. *See* 20 C.F.R. § 416.929(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [his] symptoms." 20 C.F.R. § 404.1529(c)(4). If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar). "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer*, 395 F.3d at 1210

33

(quotation marks and alterations omitted).[3]  "The question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it."  *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

### C.   The ALJ properly explained the decision not to credit Carroll's subjective testimony regarding his pain, and substantial evidence supported that decision.

The ALJ specifically stated that Carroll's statements about the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the evidence.  In this respect, the ALJ properly explained the decision to discredit Carroll's subjective testimony regarding his pain, and substantial evidence supported the ALJ's decision.

The ALJ considered the evidence, assessed the intensity, persistence, and limiting effects of Carroll's symptoms (Doc. 12-3 at 16), and articulated explicit and adequate reasons for discrediting Carroll's testimony.  *See Holt*, 921 F.2d at 1223.

---

[3] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities."  *Hargress*, 883 F.3d at 1308 (quoting SSR 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)).  But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record.  *Id.* at 1308 n.3.

The ALJ found that Carroll's alleged symptoms were not consistent with the lack of consistent or aggressive treatment, and the lack of objective evidence or clinical findings showing limitation to the degree that Carroll alleged.  Doc. 12-3 at 16.  The ALJ found that imaging of Carroll's spine showed mild or minimal problems, Carroll's gait was normal, and Carroll had normal range of motion.  Doc. 12-3 at 16–17.  The ALJ also found that, despite some abnormalities in his left shoulder, Carroll showed normal range of motion in his shoulders during his April 2019 consultative examination.  Doc. 12-3 at 17.  The ALJ relied on the fact that Dr. Oyowe noted that Carroll had no difficulty moving around, had normal gait, had normal grip strength, and had full range of motion.  Doc. 12-3 at 17.  The ALJ also relied on Dr. Kline's opinion that Carroll's anxiety was in remission and that Carroll was malingering about his physical abilities.  Doc. 12-3 at 17.

All of the inconsistencies identified by the ALJ regarding Carroll's pain and level of function explain the decision to discredit Carroll's testimony.  Furthermore, the ALJ did not entirely discredit Carroll's testimony about suffering pain, but instead found that the record *did* support some limitations.   Indeed, the ALJ determined that the evidence supported more limitations than the non-examiners or Dr. Oyowe had found during Carroll's disability proceedings.  Doc. 12-3 at 18.

In short, "[a]fter a thorough review of the evidence of record, including the claimant's allegations and testimony" (Doc. 12-3 at 19), the ALJ gave a detailed and

specific explanation of why Carroll's testimony about the limitations caused by his symptoms was not consistent with the record; the ALJ did not just present a broad rejection of Carroll's testimony. *See Dyer*, 395 F.3d at 1210. Thus, the ALJ's decision included the necessary "explicit and adequate reasons" for discrediting Carroll's subjective testimony. *Wilson*, 284 F.3d at 1225.

In this regard, substantial evidence supported the ALJ's decision to discredit Carroll's subjective testimony and find that he was not disabled. Throughout the record, there is evidence that calls into question Carroll's testimony about the severity of his symptoms and limitations. While Carroll and his mother provided statements that his pain was so severe that it prevented him from doing basically anything other than watching television (Doc. 12-7 at 12–22, 26–31; Doc. 12-8 at 40), imaging of Carroll's spine and shoulder did not indicate severe injury that would cause such pain (Doc. 12-8 at 8–10, 15–16, 19, 23–24).

In fact, a neurosurgeon noted that problems with Carroll's spine did not explain all of his symptoms. Doc. 12-8 at 9. Further, multiple doctors, including Dr. Johnson, Dr. Oyowe, and Dr. Kline, observed that Carroll had a normal gait, normal strength, and normal range of motion. Doc. 12-8 at 8, 28, 68–70, 74–75, 84, 88. Carroll reported debilitating headaches (Doc. 12-8 at 44–45), but also told Dr. Oyowe that they were relieved with over-the-counter medication (Doc. 12-8 at 67). Carroll also reported limitations because of swelling in his knees (Doc. 12-8 at 45–

46), but Dr. Oyowe found no swelling during his consultative examination (Doc. 12-8 at 67).

With respect to Carroll's mental health, Dr. Oyowe considered that Carroll had never been hospitalized for mental health issues, had not had any suicide attempts, and did not take any medication for his mental health, and opined that his mental condition did not affect his ability to work.  Doc. 12-8 at 67.  Similarly, Carroll told Dr. Kline that his anxiety was controlled by Xanax, after which Dr. Kline opined that Carroll's anxiety appeared to be in remission.  Doc. 12-8 at 73–75.  Carroll also told Dr. Kline that his other medication was working well and had no side effects (Doc. 12-8 at 73), which contradicted his testimony at the ALJ hearing that his medication had side effects and made it seem like everything echoed (Doc. 12-8 at 43).

Overall, Dr. Oyowe opined that Carroll had "no limitations" (Doc. 12-8 at 71), while Dr. Kline went so far as to opine that Carroll's mental health caused, at most, only mild limitations and that Carroll was "malingering" as to his physical abilities (Doc. 12-8 at 74–75).  Nothing in the record indicates that those assessments were unfounded.  As such, the record contains sufficient evidence calling into doubt Carroll's testimony, and the ALJ was not "clearly wrong" to discredit his subjective testimony while determining Carroll's RFC.  *See Werner*, 421 F. App'x at 939.

Finally, the ALJ's decision did not err in relying on the ALJ's own RFC

determination—which was supported by substantial evidence, *see supra*—to find that Carroll was not disabled.  Carroll argues that his limitations were work preclusive, because the vocational expert testified that absence multiple times a month and being off task more than 20% of the workday were work preclusive.  Doc. 17 at 14–15.  But, nothing in the record shows that the ALJ found that Carroll would be impermissibly absent or off task; rather, in making the RFC determination, the ALJ discredited Carroll's testimony about the severity of his symptoms and limitations, and substantial evidence supported that finding.  Accordingly, the ALJ's decision did not conflict with the testimony of the vocational expert.

In sum, there is sufficient evidence in the record based on which a reasonable person would accept the ALJ's finding that Carroll was not disabled.  *See Crawford*, 363 F.3d at 1158.  Accordingly, substantial evidence supported the ALJ's decision.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court **AFFIRMS** the Commissioner's decision.  The court separately will enter final judgment.

**DONE** and **ORDERED** this August 29, 2022.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE